IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| PENNY M.,[1] </br>     Plaintiff, </br> v. </br> </br> ANDREW M. SAUL, </br> Commissioner of Social Security, </br>     Defendant.[2] | ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) |

Civil Action No. 3:20-cv-00012

REPORT & RECOMMENDATION

By:   Joel C. Hoppe
United States Magistrate Judge

Plaintiff Penny M. asks this Court to review the Commissioner of Social Security's final decision denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that substantial evidence supports the denial of benefits in this case. Accordingly, I respectfully recommend that the Commissioner's final decision be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Commissioner Saul is hereby substituted as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe medical impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based

on his or her residual functional capacity; and, if not (5) whether he or she can perform other work existing in the economy. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4).[3] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In December 2016, Penny filed for SSI alleging that she was disabled by a herniated disc in her back, a pinched nerve, knee pain, hypertension, and high cholesterol. *See* Administrative Record ("R.") 272, 382–85, ECF No. 11. Penny was fifty-two years old, or a "person closely approaching advanced age" under the regulations, at that time. R. 18, 271; *see* 20 C.F.R. § 416.963(d). Disability Determination Services ("DDS"), the state agency, denied her claim initially in May 2017, R. 270–81, and upon reconsideration that November, R. 282–92. On April 1, 2019, Penny appeared with counsel and testified at a hearing before ALJ Suzette Knight. *See* R. 248–68. A vocational expert ("VE") also testified at the hearing. R. 263–68.

ALJ Knight issued an unfavorable decision on April 25, 2019. R. 11–19. She found that Penny had the following severe impairments: essential hypertension, left ankle fracture status-post surgery, major joint dysfunction, osteoarthritis and allied disorders, right carpal tunnel syndrome, and cervical spine degenerative disc disease. R. 13. Those impairments did not meet or medically equal the relevant Listings. R. 13–14 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 1.06, 4.04). ALJ Knight then evaluated Penny's residual functional capacity ("RFC")

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

and found that she could perform "light"[4] work; "frequently" handle and finger items with her right (dominant) upper extremity and "occasionally" push and pull with that arm[5]; occasionally operate foot controls bilaterally, climb ramps/stairs, kneel, crouch, and crawl; and never climb ladders/ropes/scaffolds or work around unprotected heights or moving mechanical parts. R. 14. Based on this RFC finding and the VE's testimony, ALJ Knight concluded that Penny was not disabled after December 2016 because she could have returned to her past "cleaner occupation as actually and generally performed." R. 17 (citing R. 264–67). Alternatively, Penny could have transitioned to other light occupations (e.g., laundry sorter, router, marker) that offered a significant number of jobs in the national economy. R. 18–19 (citing R. 266–67). The Appeals Council declined to review ALJ Knight's decision, R. 1–5, and this appeal followed.

## III. Discussion

Penny challenges ALJ Knight's RFC finding that she could do "light work" on a full-time basis during the relevant period. *See generally* Pl.'s Br. 9–15, ECF No. 15. She asserts ALJ Knight should have credited a treating-source medical opinion from Eve Bargmann, M.D., that Penny could occasionally lift/carry up to ten pounds; could occasionally stand and walk, but only walk "slowly"; needed to take extra unscheduled breaks during an eight-hour workday, and "often" needed to lie down because of pain, fatigue, or other impairment; experienced "moderately severe" pain that would cause her to be off task for 50% of a normal workday; and would miss "5+" days of work each month because of her left tibia/fibula fracture, peripheral

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b).

[5] "'Frequent' [or 'frequently'] means occurring from one-third to two-thirds of the time," or about six hours during an eight-hour workday. SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983); *see also* R. 278, 582. "'Occasionally' [or 'occasional'] means occurring from very little up to one-third of the time" and "should generally total no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5; *see also* R. 278, 582.

neuropathy, and lower back pain. *See id.* (citing R. 582–83). Had ALJ Knight adopted any of Dr. Bargmann's limitations on standing, walking, lifting, or carrying, then Penny would have been restricted to "sedentary"[6] work and should have been found "disabled" based on the VE's testimony and the Commissioner's regulations. *See id.* at 15 (citing R. 267–68; 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.09). The VE also testified that missing five days of work each month "would preclude" competitive full-time employment, "[a]ssuming that's beyond the routinely provided annual and/or sick leave." R. 268. Thus, Penny argues that Dr. Bargmann's opinions that she needed to lie down "often," would be off task for half the workday, and would miss at least five days of work every month, if credited, would also preclude full-time work. *See* Pl.'s Br. 14–15 (citing R. 268, 582–83).

I agree that ALJ Knight "failed to build an accurate and logical bridge from the evidence [she] recounted" to her conclusion about Penny's exertional abilities, *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), and did not adequately explain why she rejected Dr. Bargmann's opinion indicating that Penny could not "perform [work-related activities] for a full workday" during the relevant period.[7] *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). Thus, "because [I] cannot gauge the propriety of the ALJ's RFC assessment, [I] cannot say that substantial evidence supports the [Commissioner's] denial of benefits." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662 (4th Cir. 2017).

---

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a). Aside from the amounts of weight lifted and carried, "[t]he major difference between sedentary and light work is that most light jobs" require standing or walking for "most of the workday." SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983). Light work typically requires a total of six hours of standing and/or walking during a normal eight-hour workday, SSR 83-10, 1983 WL 31251, at *5–6, while sedentary work requires about two hours, *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010).

[7] The relevant period is December 2016, the month Penny filed her SSI claim, through April 25, 2019, the date ALJ Knight issued her decision denying that claim. R. 17, 19; *see Gray v. Berryhill*, No. 6:16cv9, 2017 WL 4296636, at *2 (W.D. Va. Aug. 8, 2017) (citing 20 C.F.R. §§ 416.202, 416.501).

5

\*

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and symptoms.[8] SSR 96-8p, 1996 WL 374184, at \*2 (July 2, 1996) (emphasis omitted). The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at \*3, the ALJ must identify each impairment-related functional limitation that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should incorporate "restrictions caused by medical impairments and their related symptoms," including pain, that affect the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis, SSR 96-8p, 1996 WL 374184, at \*1, \*2. *See Mascio*, 780 F.3d at 637–40. Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at \*7, and logically explaining how she weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings, including a decision to reject an alleged functional limitation, when it is clear that she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th

---

[8] "Symptoms" are the claimant's own description of her medical impairment. 20 C.F.R. § 416.902(n) (2019).

Cir. 2017), and she built an "accurate and logical bridge from that evidence to [her] conclusion[s]," *Woods*, 888 F.3d at 694.

"Medical opinions," or statements from acceptable medical sources about the nature, severity, or functionally limiting effects of a claimant's impairments, play a critical role in the RFC assessment. *See Brown*, 873 F.3d at 255–56, 268–72; 20 C.F.R. § 416.927(a)–(c); SSR 96-8p, 1996 WL 374184, at *7. The ALJ must explain the weight afforded to every medical opinion in the record, taking into account the nature and extent of the source's treating or examining relationship with the claimant; how well the source explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the source's medical specialty. 20 C.F.R. § 416.927(c). "In general, an ALJ should accord 'more weight to medical opinions from [a claimant's] treating sources," since they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [her] medical impairment(s).'" *Woods*, 888 F.3d at 695 (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2))). An ALJ may rely on a medical opinion from "a non-treating, non-examining source," such as a DDS reviewing physician, when

> that opinion has sufficient indicia of supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion.

*Id.* (cleaned up). The ALJ's decision must provide "a narrative discussion describing how the evidence supports [her] explanation of the varying degrees of the weight [s]he gave to differing opinions" in the record. *Id.* (cleaned up). A reviewing court should "defer to th[ose] assignments of weight unless they are not supported by substantial evidence." *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015).

A.   *Summary*

7

Penny's record contains two medical opinions discussing her physical capacities and limitations during the relevant time. R. 277–79, 582–83. In May 2017, DDS reviewing physician Richard Surrusco, M.D., provided a "current evaluation" of Penny's RFC based on records available through March of that year. *See* R. 275–79. Dr. Surrusco opined that Penny could do light work, R. 276, because she could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, and sit and stand/walk for about six hours each (with normal breaks) during an eight-hour workday, R. 278–79. He attributed these limitations to Penny's mild osteoarthritis in the hips, degenerative disc disease in the cervical spine, moderate degenerative changes in the right shoulder, "acute right ankle non-displaced fracture" that had healed with casting, and continued "joint pain, joint swelling, [and] gait problem" after the cast was removed in late March 2017. R. 278; *see* R. 507–14, 516–21, 537–38. Dr. Surrusco did not indicate whether those limitations had lasted or were expected to last for at least twelve consecutive months.

Penny established care with Dr. Bargmann at the University of Virginia Health System sometime before August 24, 2017. *See* R. 608. On that date, Penny reported during a follow-up visit with Dr. Bargmann that she fractured her right ankle after slipping and falling six months earlier, *see* R. 507–14, 537–38, and "still ha[d] swelling [with] needle-like pain [and] numbness sometimes," R. 608. Penny endorsed ankle pain again in September 2017. R. 609. She exhibited reduced range of motion in that ankle, but walked with a normal gait and did not exhibit any joint instability or tenderness. *Id.* In October, Penny reinjured her right ankle when she slipped and someone weighing more than 300 pounds "fell on her when she fell." R. 617. Dr. Bargmann diagnosed a sprained ankle. *Id.*

On December 26, 2017, Penny slipped and fell twice while climbing the steps to her house. R. 625. She could not bear any weight on her left leg when she got to the emergency

8

room. *See id.* X-rays showed a "displaced tibia and fibula fracture," *id.*, for which Penny "underwent left tibia reduction and internal fixation with tibial nailing" later that same day, R. 624. *See also* R. 602 ("Findings: Intramedullary nail fixation of spiral fracture of the distal tibia redemonstrated in unchanged alignment with mild persistence apex anterior angulation . . . with lateral displacement of the distal fracture fragment."). Penny was discharged home from the hospital on December 29, 2017. *See* R. 624. She had been working with physical therapy and "ambulated 50 ft with [a] rolling walker" the day before discharge. *Id.*

Two weeks later, Penny told her surgeon's physician assistant, Elena Saykaly, PA-C, that she was "doing well with no specific complaints other than the expected post-operative pain and stiffness." R. 590 (Jan. 10, 2018). She was adhering to "post-operative restrictions" and participating in a home PT program. *Id.*; *see* R. 725 (noting Penny used a rolling walker at home and received "home health" services). PA Saykaly fitted Penny with a fixed ankle walker ("FAW") orthotic and instructed her to "wear [it] full time except for when she is sleeping." R. 590–91. X-rays taken in February 2018 showed "incomplete" healing of the internally fixed distal left fibular facture "with mild persistent apex anterior angulation and . . . lateral displacement of the distal fracture fragment," R. 602, but "[n]o evidence of loosening," R. 593. PA Saykaly gave Penny a walking boot, instructed her to bear weight as tolerated for the next month, and referred her to physical therapy. R. 592, 719. Penny went to PT from February through July 2018. *See* R. 719–31. Contemporaneous exam notes show that she walked with an antalgic gait, R. 634, 723, 727, 731, and exhibited reduced strength and range of motion in the left ankle, R. 721–23, 727. She consistently reported pain and difficulty standing or walking. *See, e.g.*, R. 637, 725, 730. X-rays taken in April 2018 showed "[h]ealing proximal and distal fibular fractures in unchanged alignment" without evidence of hardware failure or loosening. R. 606.

On April 12, 2018, Dr. Bargmann completed a Medical Source Statement opining that Penny's left "tibia/fibula fracture, peripheral neuropathy, and lower back pain" caused "moderately severe" pain that would interfere seriously with Penny's ability to work full time. R. 582–83; *see* R. 634 (Penny reporting "leg pain" from "fracture hurts more [with] walking, pain varies," neuropathic pain, and low back pain). She opined that Penny could "occasionally" stand, meaning that she could "perform the activity from very little up to 1/3 of an 8-hour workday." R. 582. Penny also could walk without an assistive device occasionally, R. 582–83, but she needed to do so "slowly," R. 582 (emphasis omitted); *see* R. 634 ("Gait antalgic [and] broad-based."). She could occasionally lift/carry up to ten pounds, but she could not lift/carry any amount of weight on a "frequent[]" basis. *See* R. 582 ("Frequently = can perform the activity 1/3 up to 2/3 of an 8-hour workday."). She could not stoop or climb. R. 582. Additionally, Penny would miss "5+" days of work every month, would be off task "50%" of the day when she did go to work, needed to take extra unscheduled breaks throughout the day, and had to lie down "often" because of pain, fatigue, or other impairment. R. 583. Dr. Bargmann did not know whether these limitations had lasted or were expected to last for at least twelve consecutive months. *Id.*

Penny still had an antalgic gait on exams in September and October 2018. *See* R. 635, 637. She reported persistent bilateral leg pain that was worse with standing and walking. *See* R. 635, 637, 648, 683. Dr. Bargmann referred Penny to an orthopedic surgeon, R. 637, to assess ongoing "left ankle pain and weakness" that caused "difficulty walking and standing," R. 648. *See* R. 683, 693 (noting Penny had these symptoms "for quite some time and was treated non operatively" by Dr. Bargmann, but "had failed all non operative measures" including "multiple physical therapy" sessions). On October 19, Venkat Perumal, M.D., fitted Penny with a new custom FAW to immobilize her left foot and ankle and "disperse plantar pressure to reduce pain

10

with walking." R. 686–87. Diagnostic images showed "prominent navicular with tibialis posterior tendon tear/tendinitis" and osteochondritis dissecans ("OCD") of the talus in her left ankle. R. 691. Dr. Perumal recommended "tibialis posterior tendon repair [and] . . . transfer, partial excision of navicular, ankle scope extensive debridement[,] and OCD microfracture." *Id.* He explained that, "in general, 50% of healing [would] be complete by 3 months, 75% by 6 months, and 90% by 9 months." R. 692. Penny had this surgery on January 11, 2019. *See* R. 692–94. Two weeks later, she reported "very minimal pain" in her left ankle, but she still wore a short leg cast and was "non weightbearing" on that leg. R. 696.

Penny testified before ALJ Knight on April 1, 2019. *See* R. 248–63. She explained that she could not work any more because her "legs [were] really bad," with her left ankle and foot being the primary problem. R. 259. Penny could tend to her personal needs, R. 262, but it took her "a good hour" to shower, dress, and have a cup of coffee in the morning, R. 260. She spent most days sitting in a recliner doing crosswords or playing games on her phone. R. 260, 262–63. Sometimes she sat with her sister's preschool-aged grandchildren while they watched cartoons or played in the living room. R. 260–61. Her sister installed a gate to keep the children in one room while Penny watched them. R. 261 ("[M]y sister will lock the gate. There's a gate in the living room that keeps them right there, because I can't run after them."). Penny could "do a little bit of dusting and a little bit of vacuuming," R. 262, and make "quick" snacks or microwave meals, R. 261. She attended church "once in a while" and went grocery shopping once a month for one hour. R. 262–63. She used an electric cart at the grocery store because she couldn't "walk that long." R. 262; *see also* R. 723–24 ("[R]eports that she still uses scooter at the store for long trips. . . . [G]ait remains antalgic." (June 26, 2018)).

\*\*

ALJ Knight summarized some of this evidence in her RFC assessment. *See* R. 15–17. She found that Penny's medical impairments—including left ankle fracture status-post surgery and major joint dysfunction—could reasonably be expected to cause her alleged pain, but that Penny's statements describing the intensity, persistence, and limiting effects of that pain were "not entirely consistent with the medical evidence and other evidence in the record," for two reasons. R. 15. First, Penny "received relatively sporadic and conservative treatment other than [the] two ankle surgeries," *id.*, she underwent in December 2017 and January 2019. *See* R. 15–16. Second, Penny's "limited" daily activities, including grocery shopping "once a month" while using an "electric cart," and "watch[ing] her sister's young grandchildren," "suggest[ed] she could work on a full time basis" during the relevant period. R. 15.

ALJ Knight gave "partial weight" to Dr. Surrusco's May 2017 opinion that Penny could do light work "because he [was] familiar with the regulations and standards of the Social Security Act" even though he "was not able to examine [Penny] in person." R. 16. She also found that Penny "received relatively conservative medical treatment in 2017 despite her lower extremity and gait issues, suggesting light exertion work could be performed." *Id.* ALJ Knight gave "little weight" to Dr. Bargmann's medical opinion from April 2018 because it was provided "a few months after [Penny's] first left ankle surgery . . . while she was still in physical therapy," and Dr. Bargmann "did not know" if the limitations she identified "would last for twelve consecutive months." R. 17. Thus, ALJ Knight concluded that Dr. Bargmann's opinion was "not a good indicator" of Penny's "longitudinal functional capacity." *Id.* She also found that the doctor's "lifting and carrying restrictions seemed overestimated . . . since most of [Penny's] medical treatment had addressed her lower extremities." *Id.*

ALJ Knight concluded that Penny could have performed "light exertion work" at any

time since December 2016, R. 17, as long as that work did not require (as relevant here) more than "occasionally" climbing ramps and stairs or operating bilateral foot controls, R. 14. She explained that this RFC was "supported primarily by Dr. Surrusco's opinion," evidence that Penny's "medical treatment ha[d] been relatively sporadic and conservative other than her two ankle surgeries" and that "[a]fter the first surgery, her pain decreased significantly with physical therapy," and radiographic images showing "generally mild findings." R. 17.

B.     *Analysis*

"[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. The second component, the ALJ's logical explanation" about how she weighed relevant evidence using the correct legal standards, "is just as important as the other two." *Thomas*, 916 F.3d at 311. In this case, ALJ Knight's analysis of Penny's RFC during the relevant period "contains too little logical explanation," *id.*, for me to say that the "decision is supported as a matter of fact and law," *Kenne v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). First, ALJ Knight concluded that Penny could perform light work after December 2016, R. 17, and "summarized evidence [s]he found credible, useful, and consistent," *Woods*, 888 F.3d at 694. *See* R. 15–17. But the ALJ never logically explained how she concluded—based on this evidence—that Penny could perform the tasks required by light work, such as frequently lifting or carrying ten pounds and standing or walking for six hours during the workday. *See id.* Her reliance on Dr. Surrusco's opinion that Penny could performed those tasks in May 2017—seven months before Penny underwent the first of two reconstructive ankle surgeries in just over a year—does not support the ALJ's conclusion that Penny could have performed those activities on a regular and continuing basis during the entire relevant period. After December 2017, Penny spent most of the relevant period recovering from ankle surgeries and using a hand-held assistive

13

device or custom ankle brace to help her walk. R. 590–91, 592, 624, 686–87, 696, 725. She consistently reported lower extremity pain or weakness that made it difficult to stand and walk for extended periods. *See* R. 590, 608–09, 617, 625, 634, 637, 648, 683, 693, 725, 730. Exam notes show Penny had an abnormal gait, R. 634, 635, 637, 696, 723, 727, 731, and decreased strength, stability, or range of motion in the left ankle, *see* R. 609, 686, 689, 691, 695, 721–23, 727. ALJ Knight summarized some of this evidence, but she did not explain how it factored into her conclusion that Penny could have frequently carried ten pounds and done "a good deal of standing or walking," 20 C.F.R. § 416.967(b), for eight hours a day, five days a week during the same time.

Second, ALJ Knight did not acknowledge that Dr. Bargmann had an established treating relationship with Penny when she gave her opinion in April 2018, and continued to see Penny on a regular basis until Penny had her second ankle surgery in January 2019. ALJ Knight "may not have been so quick to reject" Dr. Bargmann's opinion of Penny's physical limitations had she "properly considered the treatment relationship" between Penny and her primary-care provider. *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 386 (4th Cir. 2021). This is significant because Penny would have been restricted to "sedentary" work and should have been found "disabled" based on the VE's testimony and the Commissioner's regulations, had ALJ Knight adopted *any* of Dr. Bargmann's limitations on standing, walking, lifting, or carrying. *See* Pl.'s Br. 15 (citing R. 267–68; 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.09). The fact that Dr. Bargmann did not know whether those impairment-related limitations had lasted or were expected to last twelve continuous months, R. 17 (citing R. 583), is of no moment. It was ALJ Knight's responsibility to make that determination based on all the relevant evidence in Penny's longitudinal record.

14

Finally, ALJ Knight appears to have rejected Dr. Bargmann's specific opinions about Penny's inability to work for eight hours a day, five days a week, R. 16–17 (citing R. 582–83), because she found Penny's "limited" daily activities "suggest[ed] she could work on a full time basis," R. 15. "A claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 101 (4th Cir. 2020). The "critical differences" between basic activities of daily living such as getting dressed or going grocery shopping "and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons, and is not held to a minimum standard of performance, as she would be by an employer." *Id.* (cleaned up). Here, ALJ Knight recognized that Penny lived with her sister and her "daily activities [were] limited" to things like making simple meals, grocery shopping once a month, and playing games on her phone while resting in a recliner. R. 15. Those activities fully accommodate Dr. Bargmann's opinion that Penny needed to rest or lie down throughout the day, would miss five days of work each month, and would be off task for half the workday because of her "moderately severe" lower extremity pain, R. 582–83. The ALJ must explain why she rejected this portion of Dr. Bargmann's medical opinion.

\*\*\*

I take no position on whether Penny is entitled to disability benefits. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Penny cannot prove she was disabled based on the medical evidence alone, provide a logical link between the evidence the Commissioner found credible and the RFC determination.

### IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's motion for summary judgment, ECF No. 16, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings, and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: June 8, 2021

Joel C. Hoppe
United States Magistrate Judge